Foster, P. J.
Claimant’s intestate died of injuries received as the result of a collision between his automobile and a road scraper or grader. This machine was being operated under the immediate direction of the County of Saratoga, which had a written contract with the State of New York to remove snow and ice from the highway where the accident happened. Upon a finding that the State was negligent the Court of -Claims awarded a judgment to the claimant for the sum of $137,566.74, which included interest and an award for conscious pain and suffering in the sum of $1,000. The State has taken an appeal from this judgment on the ground that it is contrary to the law and the facts, and also on the basis that the award of $125,000 for wrongful death is excessive. Claimant has cross appealed solely on the ground that the awards for death and conscious suffering are inadequate.
The opinion of the Trial Judge clearly and succinctly discusses the facts. We shall summarize them but briefly.
The accident happened on January 28, 1947, at about 5:20 p.m., on a three-lane concrete State highway known as Route 9P, within the outside tax district of the city of Saratoga Springs. This highway runs generally in an easterly and westerly direction. Claimant’s intestate was driving his automobile westerly on the north lane of the highway, which was his own side of the road. He was alone in his car at the time, but two other cars were following' not far behind him. The road scraper, with *495 which his car collided, was moving down grade in an easterly direction at a slow rate of speed, and also on the north lane of the highway. The proof indicates that it was driven on what would normally be its wrong side of the road for the purpose of scarifying ice on the highway because it did not have sufficient power to do such work moving up the grade that existed there. It was a large machine, some twenty-seven feet long and weighed about eleven tons. It was dark at the time, and the only lights on the scraper were two white lights, with lenses about six inches in diameter, attached to the front corners of the driver’s cab about ten feet above the level of the pavement.
Claimant’s intestate was driving up grade at a speed of twenty-five or thirty miles an hour. The court below has found that the headlights on his car were turned on, and although it is vigorously asserted for the State that only his parking lights were on, nevertheless there is evidence to sustain the finding as made, and we are constrained not to disturb it. But even if it is assumed that only his parking lights were on we do not think a failure to have full lights on was a proximate cause of the accident under the circumstances. It was found on convincing testimony that the lights of the scraper, high above the level of the pavement, appeared to be in line with the street lights of the same color along the north edge of the highway. From this the inference may be fairly drawn that a dangerously deceptive situation was presented against which lights of any kind on an. approaching automobile would afford little or no protection. It is significant that neither driver of the two cars behind decedent saw the scraper before the accident happened although it occurred on the upgrade. No warning of any kind, other than the lights mentioned which were attached to the top of the scraper’s cab, was given to indicate the position of the scraper on the highway. Substantially on the basis of these facts the court below held that decedent was not guilty of contributory negligence, and that the State was negligent in failing to have the scraper properly lighted or other adequate warning of its position given. Leaving aside for the moment the legal question of whether the State was liable in any event we think the issues of negligence were properly resolved in favor of the claimant. The language of factual findings as made by the court below is criticized in several particulars, chiefly on the alleged ground of inaccuracy. In our view the language used was well within permissible limits consistent with the testimony, and we find no persuasive reason for any changes.
*496 In our opinion the chief question presented is the challenged liability of the State. The scraper was owned by the Town of Saratoga, and its operator at the time was an employee of the County of Saratoga . The county in turn was engaged in removing ice from a highway under a written agreement with the State, which had been executed for the State by the Superintendent of Public Works. The State first takes the position that the county was an independent contractor, and if there was negligence on the part of those under its immediate direction it was collateral in character for which the State is not liable; and second, that under the Highway Law (§12) the Superintendent of Public Works was not authorized to make the agreement, and hence the same was ultra vires. We shall discuss these points in their inverse order.
The agreement recites that it was made pursuant to chapter 305 of the Laws of 1946 (Highway Law, § 12). This statute provides that the maintenance of State highways in towns and incorporated villages shall be under the direct supervision of the Superintendent of Public Works of the State, who shall be responsible therefor, and shall include control of snow and ice on such highways. The work of such control may be done by a county, town or incorporated village, and the superintendent is authorized to make an agreement with any of these municipalities for this work upon such terms, rules and regulations as he may deem for the best interest of the public. Nothing is said in the statute about highways located within cities. But section 344 of the Highway Law provides that the State shall not maintain a highway within the limits of a city 11 excepting that portion of a third class city lying outside of its corporation tax district where such city embraces the entire area of a former township * * * ”. The City of Saratoga Springs is a third class city and embraces the entire area of the former Township of Saratoga Springs. It has three tax districts which include an inside and an outside tax district. Its inside tax district evidently corresponds to what the statute quoted refers to as “ the corporation tax district ”, for it embraces what was formerly the Incorporated Village of Saratoga Springs. The highway where the accident happened lies in the outside tax district, and the State concedes that it had the duty to maintain it, but now denies it had any duty to control snow and ice thereon. Evidently when the agreement was made those in authority thought otherwise, and concluded that sections 12 and 344 of the Highway Law should be read together, or else determined *497 that the outside district of Saratoga Springs was in the same category as a town within the meaning of section 12.
The Charter of the City of Saratoga Springs (L. 1916, ch. 229 as amd.) gives support to the latter view. Section 4 of title II thereof describes the inside tax district and the outside tax district as separate highway districts. Section 5 provides that the outside district shall be treated as a separate town for the purpose of fixing excise taxes. Section 8 makes the city tax district, which embraces the territory within the boundaries of the former town, liable for the debts of the town but also provides that this district shall be entitled to all State aid in support of highways in the same manner as if the territory continued as a town; and it further makes the inside tax district liable for all the debts and liabilities of the former Village of Saratoga Springs. Thus it would appear that the outside tax district was continued for all practical purposes as a town highway district. This conclusion is fortified by testimony given by the county superintendent of highways to the effect that the outside district still has a town superintendent of highways, appointed by the superintendent of public works of the city with the approval of the civil service commission. And also by the testimony that the scraper involved in the accident was owned by the Town of Saratoga.
From the foregoing it is apparent that authority for the agreement made by the State with the County of Saratoga can be justified either by reading sections 12 and 344 of the Highway Law together, or else upon the basis that the outside tax district of the City of Saratoga was in effect a town highway district within the meaning of section 12 of the Highway Law. The argument that the agreement was ultra vires must therefore be rejected.
As to the other point presented by the State the court below refused to find as a conclusion of law that the county was an independent contractor. We agree with this conclusion. The language of the agreement itself precludes a contrary finding. It is unnecessary to set forth the agreement in full to indicate our reasons for this view. A few quotations will suffice. For instance the agreement provides: ‘ ‘ WHEREAS, the County acting as the arm of the State, is willing to perform the function so delegated to it for the work of such control of snow and ice upon such terms, rules and regulations as may be deemed by the Superintendent to be for the best interest of the State ”. The rules and regulations which also form a part of the agreement provide: “ All work under this agreement shall at all times be *498 under the direction of the Superintendent and his interpretations and decisions shall be final and conclusive. The work shall be performed under the supervision of the District Engineer, hereafter known as the Engineer, in whose District the County is located. * * * ” These quotations alone we think clearly negative the idea that the county was an independent contractor within the accepted meaning of that term, and indicate to the contrary that the county was acting as the employee of the State so that the doctrine of respondeat superior applies. The court below did not find this in so many words but it made a finding to the same effect when it said that the Superintendent of Public Works retained control and supervision of snow removal at the time and place of the accident under its contract with the County of Saratoga. Such would be the ruling if the effect of a similar agreement between individuals or private corporations had to be construed, and the State has consented to have its liability determined in accordance with the same principle (Court of Claims Act, § 8). Between private parties control and supervision are cardinal indicia of an employer relationship (Hoffman Bros., Inc., v. Commercial Union Assur. Co., 221 App. Div. 167, affd. 248 N. Y. 578; Matter of Glielmi v. Netherland Dairy Co., 254 N. Y. 60).
In finding that the State was negligent in failing to see that a proper warning was given of the scraper’s position the court below also found that this duty to warn was nondelegable. It seems to us that the State was liable under both theories. Since it retained control and supervision of ice removal at the place in question it was liable as an employer for the negligence of its employee, and by the same token it had a nondelegable duty to exercise the care which the circumstances required which it could not escape by failing to exercise the direct supervision which the agreement authorized. Some point is made by the State that the movement of the scraper facing traffic was a violation of the agreement because special permission for such a movement had not been obtained from the district engineer. Undoubtedly, so far as the proof is concerned, there was such a violation, but we deem this to be immaterial. If the State, acting through its district engineer, chose to neglect the supervision which it was entitled to exercise under the specific terms of the agreement it cannot now complain against a third party that the agreement was violated.
The last point of the State is that the verdict is excessive. It is a large verdict, the largest which has come to our attention in a death case, but after carefully scrutinizing the evidence *499 on this phase of the case we feel that the amount was justified. Decedent was a lawyer of unusual talent and ability. He was thirty-nine years of age and apparently in good health. He had a life expectancy of something over twenty-eight years. He was a member of a well-known law firm and was earning at the time of his death about $15,000 a year. He left a widow as his sole next of kin, who was twenty-eight years of age and had a life expectancy of something over thirty-six years. The testimony indicates that she received from the decedent about $100 a week for some time prior to his death,, plus other benefits.' The testimony as to decedent’s ability and habits indicated that he had not reached the peak of his earning capacity and that under normal circumstances he had a still more brilliant future before him. Certainly the amount of the verdict was not arrived at as the result of sympathy or passion, or prejudice of any kind, and we cannot find under all of the circumstances that it was so excessive as to shock the conscience. We are also mindful that courts should not attempt to do indirectly what the Constitution prohibits the Legislature from doing directly (N. Y. Const., art. I, § 16), and where the evidence fairly sustains the verdict courts are not empowered to declare it excessive upon some economic theory that there must be a limit to a verdict in a death case. Claimant has cross appealed on the ground that the awards for wrongful death and conscious suffering are inadequate. We find no merit to this appeal.
The judgment should be affirmed, with costs.